# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARREN RICHARDSON,

    Plaintiff,

        v.

PRISONER TRANSPORT SERVICES OF AMERICA,

    Defendant.

NO. 3:15-CV-01061

(JUDGE CAPUTO)

## **MEMORANDUM**

Presently before me is Defendant Prisoner Transport Services of America's ("PTS's") Renewed Motion for Judgment as a Matter of Law or, in the Alternative, to Amend the Judgment (Doc. 155). Plaintiff Darren Richardson filed suit against PTS in 2015, alleging that he was abused by PTS and its agents, who extradited Richardson from Florida to Pennsylvania to answer for a probation violation. At trial, PTS moved for judgment as a matter of law on all of Richardson's claims—negligence, assault and battery, intentional infliction of emotional distress, and violations of civil rights secured by 42 U.S.C. § 1983—and his prayer for punitive damages. I granted PTS's motion as to Richardson's Section 1983 claim, but otherwise denied it. PTS then presented its evidence, and the case was submitted to the jury.

The jury found PTS's agents intentionally inflicted emotional distress, found the agents' actions attributable to PTS, and awarded Richardson $250,000 in compensatory damages and $200,000 in punitive damages; the jury found in favor of PTS on all other claims. PTS now argues that, given the jury's findings and the evidence presented at trial, it is entitled to judgment as a matter of law because its agents' conduct was not sufficiently outrageous for an emotional distress claim, and, in any event, PTS cannot be held responsible for the outrageous conduct of its agents. The jury's verdict was supported by sufficient evidence and was not legally erroneous, though, so PTS's motion will be denied.

## I. Background

On May 29, 2013, Richardson was pulled over in Hernando County, Florida, for driving through a stop sign without fully stopping. (Doc. 159 at 64-66). The police officer who pulled Richardson over told him that there was an outstanding warrant for his arrest in Pike County, Pennsylvania. (*Id.* at 65). The warrant was issued because, among other things, Richardson failed to pay a $250 fine at the end of his probation (to which he was sentenced for writing a bad check to his brother-in-law). (*Id.* at 58-59, 122-23).

Pike County chose to extradite Richardson, so it hired PTS to transport him from Florida to Pennsylvania. PTS extradition agents picked up Richardson from the Hernando County jail on June 10, 2013. (*Id.* at 73-74). Richardson was dropped off at the Pike County jail on June 15, 2013. (*Id.*). Most of what happened during that trip from Florida to Pennsylvania was disputed by the parties; one thing PTS never challenged, though, was that Richardson developed post-traumatic stress disorder ("PTSD") from his trip.

To briefly summarize the evidence presented at trial: Richardson contended that PTS's agents physically and psychologically abused him by forcing him to urinate and defecate where he sat, pointing a shotgun at his head (which unbeknownst to him was non-lethal), stepping on his shackles, depriving him of food, and urinating on him for refusing to perform a sexual act on an agent. (Doc. 175 at 23-24). PTS agents did this to Richardson, at least in part, because he asked for bathroom breaks. (*See* Doc. 159 at 84). PTS denied these allegations, pointing to documents and testimony indicating Richardson was properly fed, given regular bathroom breaks, and arrived at the Pike County jail in good condition. And while PTS did not dispute Richardson's PTSD diagnosis, it did dispute the extent of Richardson's damages. (*See* Doc. 163 at 127-145).

Before the case was submitted to the jury, PTS moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on all of Richardson's claims. (Doc. 161 at 14-25). PTS argued that Richardson produced insufficient evidence that PTS or its agents were negligent, that PTS could not be vicariously liable for the intentional torts of its agents, and that the evidence was insufficient to establish PTS's liability under Section

2

1983. (*See id.*). I granted PTS's motion as to the Section 1983 claim, but otherwise denied it. (*Id.* at 35-37).

On December 11, 2018, the jury returned the following verdicts: (1) PTS and its agents were negligent, though the jury awarded no compensatory damages; (2) PTS's agents' conduct was "part of their work" (*i.e.*, fell within the scope of their employment); (3) PTS agents did not commit assault and battery; and (4) PTS agents intentionally inflicted emotional distress. For that fourth verdict, the jury awarded $250,000 in compensatory damages. And the jury further awarded $200,000 in punitive damages. (*See* Doc. 146). The judgment (Doc. 147) was subsequently amended to account for delay damages available under Pennsylvania law, bringing the total judgment to $477,733.93. (Doc.166).

PTS filed its instant Renewed Motion for Judgment as a Matter of Law or, in the Alternative, to Amend the Judgment on January 8, 2019. (Doc. 155). The motion has been fully briefed and is now ripe for review.

## II. Legal Standard

PTS moves both for judgment notwithstanding the verdict (under Federal Rule of Civil Procedure 50(b)) and to amend the judgment (under Federal Rule of Civil Procedure 59(e)). Under Rule 50(b), "judgment notwithstanding the verdict may be granted . . . only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (quotation omitted). "[T]he court should review all of the evidence in the record" and must "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). That in turn means the court "must disregard all evidence favorable to the moving party that the jury is not required to believe"—*i.e.*, all but "uncontradicted and unimpeached" evidence from "disinterested witnesses." *Id.* at 151 (quotation omitted). A court must not, however, "make credibility determinations or weigh the evidence." *Id.* at 150.

As for PTS's alternative request for amendment of the judgment under Rule 59(e), only the "need to correct clear error of law or prevent manifest injustice" could justify

3

amendment. *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (citation omitted). So "if the jury erred as a matter of law" in reaching its verdict, that error can be rectified through a Rule 59(e) motion. *Keifer v. Reinhart Foodservices, LLC*, 563 F. App'x 112, 115 (3d Cir. 2014).

### III. Discussion

PTS contends that judgment should be entered in its favor for two reasons: (1) the outrageous conduct that supported the emotional distress claim is by its very nature conduct that cannot be imputed to PTS under principles of vicarious liability; and (2) based on the jury's other findings (namely, that PTS's agents did not commit assault and battery), the evidence was insufficient for the jury to conclude PTS's agents intentionally inflicted emotional distress. (*See* Doc. 175 at 17-24). Richardson counters that the evidence he presented was sufficient for findings of intentional infliction of emotional distress and vicarious liability. (Doc. 196 at 17-23). Additionally, Richardson argues that the fact the jury found PTS not liable for assault or battery does not mean I must, in assessing the emotional distress claim, disregard evidence that could have supported a finding of assault or battery. (*Id.* at 19 n.1).

### A. Intentional Infliction of Emotional Distress

I address PTS's challenge to the intentional infliction of emotional distress verdict first. PTS relies throughout its briefing on the jury's finding of no liability for assault or battery, which PTS submits means the jury found that "PTS agents did not strike Mr. Richardson; did not hold a shotgun to his head; did not step on his shackles; did not attempt to extort sexual contact or urinate on him for refusing; did not threaten to allow other prisoners to attack him; did not threaten to shoot him in the back; did not kick his feet for refusing to trade his belongings for a 'more comfortable ride.'" (Doc. 175 at 23). Thus, according to PTS, the remaining evidence of misconduct presented at trial—that Richardson was inadequately fed, "was not permitted to use a restroom," and was forced to urinate and defecate "where he sat"—is insufficient to support the jury's verdict on Richardson's emotional distress claim. (*Id.* at 23-24).

4

What PTS is really arguing, without saying it, is that the verdicts the jury reached are inconsistent—that is, in order to have found PTS liable for intentional infliction of emotional distress, the jury must have also found PTS liable for assault and battery. But, as Richardson hints at, (Doc. 196 at 19 n.1), PTS cannot now raise a challenge to the consistency of the verdicts on a Rule 50(b) or 59(e) motion. The verdict form asked the jury to reach general verdicts as to assault, battery, and intentional infliction of emotional distress. (*See* Doc. 146 at 3-5)*; cf. Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 190 (3d Cir. 2015) (verdict form "best understood as a general verdict form with special questions" where it "did not require the jury to make special written findings as to questions of fact, but rather asked the jury to check a box indicating whether a particular defendant was liable for misrepresentation, and, if so, based on what type of misrepresentation: negligent or intentional"); *Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir. 1992) (verdict form that asked the jury whether the defendant was liable under four alternative theories constituted general verdicts on different legal theories). Because PTS failed to object to any inconsistency in the general verdicts before the jury was excused, it has waived "*any* objection in that regard," *Frank C. Pollara Grp., LLC*, 784 F.3d at 191 (emphasis added), and cannot now argue the jury could not have found PTS liable on one legal theory but not another.

Moreover, PTS's instant motion is by necessity a *renewed* one. "[T]hat Rule 50(b) uses the word 'renew[ed]' makes clear that a Rule 50(b) motion should be decided in the same way it would have been decided prior to the jury's verdict, and that the jury's particular findings are not germane to the legal analysis." *Chaney v. City of Orlando*, 482 F.3d 1221, 1228 (11th Cir. 2007); *accord In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 n.15 (2d Cir. 2016) (verdicts are not reviewed for consistency on a Rule 50(b) motion; "a judge, assessing a motion for judgment as a matter of law, looks only to the evidence in the record; she is not bound by a jury's answers in special interrogatories"); *Rogers v. Cofield*, No. Civ.A. 08-10684-MBB, 2011 WL 6140974, at *18 (D. Mass. Dec. 8, 2011) (collecting cases); *cf. Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 451 n.5 (3d Cir. 2003) (despite

5

potential inconsistency between a verdict of liability for a breach of warranty claim but no liability for a breach of contract claim, there was "sufficient evidence to support the verdict on the breach of warranty claim and consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment" (quotation omitted)). So I cannot carve out the evidence Richardson presented at trial that, in PTS's estimation, would be inconsistent with the jury's finding of no liability for assault and battery. Instead, I must look to the state of things when PTS made its Rule 50(a) motion and consider the entire record.

I cannot start down that path, however, because PTS has also waived its insufficiency of the evidence argument. PTS did not move for judgment as a matter of law at trial on the ground that the evidence was insufficient to support an emotional distress claim. Rather, PTS argued that its agents' conduct fell outside the scope of their employment and did not further PTS's business interests. (*See* Doc. 161 at 19-21). That argument was not "sufficiently specific" enough to put Richardson or the Court on notice that PTS was making (or going to make) a challenge to the sufficiency of the evidence. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1173 (3d Cir. 1993). PTS therefore failed to preserve such a challenge for its instant Rule 50(b) motion, and, having been waived, I may not consider it. *Id.* at 1174. Regardless, even if PTS's sufficiency of the evidence challenge was forfeited rather than waived, *see Robinson v. First State Cmty. Action Agency*, — F.3d —, 2019 WL 1431924, at *3 (3d Cir. Apr. 1, 2019), or not waived at all, the challenge is meritless. The laundry list of shocking allegations that PTS itself notes were before the jury, (*see* Doc. 175 at 23-24), and PTS's agents' position of actual authority over Richardson, *see Jordan v. City of Phila.*, 66 F. Supp. 2d 638, 643 (E.D. Pa. 1999) (citing Restatement (Second) of Torts § 46 cmt. e), were plenty for the jury to find intentional infliction of emotional distress.

PTS's motion will accordingly be denied as to the intentional infliction of emotional distress verdict.

**B.     Vicarious Liability**

Next is PTS's argument that the jury erred in finding PTS vicariously liable for its

agents' intentional infliction of emotional distress. Under Pennsylvania law, an employer is vicariously liable for the acts of its employees "which are committed during the course of and within the scope of [their] employment." *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979). This is so even if those acts constitute intentional torts. *Id.* An employee's conduct occurs within the scope of employment "if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master." *Id.* at 1272 (quoting Restatement (Second) of Agency § 228). But if "the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Id*. And "[i]f an assault is committed for personal reasons or in an outrageous manner, it is not actuated by an intent of performing the business of the employer and is not done within the scope of employment." *Id.* (citing *Lunn v. Yellow Cab Co.*, 169 A.2d 103 (Pa. 1961)).

To impose vicarious punitive damages on an employer, the plaintiff must make three showings: (1) the employee acted within the scope of employment, as set forth above; (2) the employee's conduct was "rather clearly outrageous," *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1278 (3d Cir. 1979) (en banc) (quotation omitted); and (3) the employee acted with the intent to further the employer's interests. *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1265 (Pa. Super. Ct. 1983).

PTS argued in its Rule 50(a) motion that Richardson's evidence showed PTS's agents did not act "in furtherance of the business activity of the company," (Doc. 161 at 19:22-23), and that is what PTS argues in its instant motion. PTS maintains that the outrageous conduct that supports an emotional distress claim cannot further PTS's interests and cannot fall within the scope of its agents' employment. (Doc. 200 at 5-8). Thus, according to PTS, both of the jury's damages awards (compensatory and punitive) must be vacated. (*Id.*). But Richardson produced sufficient evidence from which a jury could

7

conclude that PTS's agents' acts (1) were outrageous; (2) were committed with the intent to further PTS's interests, which included maximizing the number of prisoners transported on its vans and keeping its vans moving to meet deadlines; and (3) fell within the scope of employment.

    1. Outrageous acts

First, as discussed above, the jury found that PTS's agents' acts constituted intentional infliction of emotional distress, and PTS cannot now challenge the sufficiency of the evidence underlying that finding or the consistency of the jury's verdicts. (*See* Doc. 196 at 20, 23 n.2). In any event, conduct that intentionally inflicts emotional distress is by its very nature extreme and outrageous, thus constituting "a basis for the underlying cause of action, as well as a punitive award." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1279 (3d Cir. 1979) (en banc).

    2. Committed with the intent to further PTS's interests

Second, the evidence Richardson produced at trial showed that PTS's interests included keeping its transport vans full and moving, and that PTS's agents acted with the intent to further those interests.

As for PTS's interests, Frank Caruso, PTS's director of operations, confirmed that Richardson was transported from Florida to Pennsylvania via a circuitous route that took the van up and down Florida, then through Alabama, Georgia, Tennessee, Kentucky, West Virginia, Virginia, Maryland, Southeastern Pennsylvania, New Jersey, then to Richardson's final stop in Northeastern Pennsylvania. (Doc. 159 at 11-14). The van took this route to pick up and drop off over fifty (50) different prisoners PTS was paid to extradite. (*See id.* at 18:23-25, 19:1-2). Taking a "straight line" route from Richardson's pick-up location to his drop-off point would have, in Caruso's words, "bypass[ed] other people's drop-off locations as well as opportunities to pick up and then drop off other individuals along the same route," which would "[a]bsolutely" increase PTS's costs. (*Id.* at 33:1-6). Cost is also why PTS only transports prisoners by air in cases of a prisoner's medical condition, extreme distances, or tight deadlines. (*See* Doc. 193 at 20:15-25, 21:1-6). In Richardson's case, Pike County

paid PTS a flat fee, based on the number of miles on the shortest route between Richardson's pick-up and drop-off locations—not the actual number of miles traveled. (*See* Doc. 193 at 174:2-14; 176:11-25, 177:1-4). Richardson was picked up in Florida by PTS on June 10, and the deadline for his drop-off was June 13. (Doc. 193 at 165:5-7, 175:3-11).

With regard to using the bathroom, PTS employees testified as follows:

- Caruso testified that it is a "challenge" when "we're constantly moving and trying to call ahead [to local prisons] to line up a [secure] restroom break . . . ." (Doc. 159 at 29:2-4).
- PTS agent James Doss testified that "inmates in [his] custody would sometimes urinate or defecate on themselves," and that he would "send agents back into the cages to clean that up while the van was moving." (Doc. 184 at 55:11-25, 56:1-8). He also testified that because he was "on a time schedule," he would have prisoners sign off on paperwork indicating they had been provided restroom breaks and meals when they were dropped off at their destination, rather than "dig all the paperwork out" for each individual stop. (*Id.* at 60:5-25).
- PTS agent Dawn Kramer testified that there were occasions on which prisoners would urinate in plastic water bottles when restroom stops were impractical. (*See* Doc. 185 at 21:9-24). She also testified that on at least one of her trips, an inmate defecated on himself. (*Id.* at 23:17-20).
- PTS agent William Graves also testified that "inmates would urinate in water bottles[.]" (Doc. 189 at 72:16-23). He acknowledged that, on Richardson's trip, the paperwork agents filled out may have indicated that Richardson was not provided the number of restroom breaks PTS policy requires. (*Id.* at 71:18-21).
- PTS agent Ken Adams testified he "tried" to stop for restroom breaks every four hours, which "helped [him] get down the road and do [his] job," but that sometimes jails along the route would not allow PTS to bring its prisoners in

9

to use their bathrooms. (Doc. 190 at 53:21-25, 54:1-17). Accordingly, Adams understood PTS's four-hour restroom break policy to be "flexible," taking into consideration the availability of jail bathrooms along the route. (*See id.*; *id.* at 56:6-19).

- PTS agent Kevin Bivins also recalled occasions where prisoners urinated or defecated in their pants, or urinated in plastic bottles. (Doc. 183 at 37:17-25, 38:1-5).

And as to conditions on the van, witnesses testified as follows:

- Graves testified that he believed Doss "had the capacity" to commit "assaults on prisoners" and "aim[] shotguns at them." (Doc. 189 at 63:11-25, 64:1-2). He also recalled, when he worked with Doss, that Doss threatened prisoners. (*Id.* at 64:9-15). According to Graves, Doss even sprayed chemical spray on a prisoner while inside a transporter. (*Id.* at 71:22-25, 72:1-3).

- Richardson testified that when he was on PTS's van, he "would get smacked around. If they asked you something or you complained, they would stand and put their feet on the shackles around your ankles, which is excruciating, and *would do that if you asked for a restroom . . . .*" (Doc. 159 at 84:9-17 (emphasis added)). Richardson was thus forced to urinate and defecate where he sat. (*See id.* at 81:1-24). Richardson was abused in other ways, too: a PTS agent (perhaps Doss) pointed a shotgun at his head and in his mouth. (*Id.* at 84:18-25). Doss threatened Richardson, commanded him to perform oral sex, and when he refused, Doss urinated on him. (*Id.* at 85:19-25, 86:1-14). Doss also verbally abused Richardson, and told other prisoners on the van that Richardson was a "baby raper." (*Id.* at 86:15-25, 87:1-12).

On the basis of this testimony, a reasonable jury might determine that PTS's agents acted pursuant to "personal ill will or malice." *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1264 (Pa. Super. Ct. 1983). But a reasonable jury could also conclude, as this jury did, that PTS's agents' actions were taken with the intent to further PTS's interests. A jury

could conclude that PTS's interests included keeping vans full and moving to keep costs down and meet deadlines, on the basis of Caruso's testimony alone. A jury could conclude that too many restroom breaks conflicted with PTS's interests because they were impractical and slowed trips down—hence why agents indicated that PTS's restroom break policy was "flexible" or simply not followed. And a jury could conclude that, because he asked for trip-delaying restroom breaks, Richardson was outrageously abused by agents "overzealously safeguarding" PTS's interests. *Hannigan v. S. Klein's Dep't Store*, 1 Pa. D. & C.3d 339, 350 (C.P. Phila.), *aff'd*, 371 A.2d 872 (Pa. Super. Ct. 1976) ("The jury had reason to find that [the department store's employee's] behavior towards Mrs. Hannigan was outrageous, because in overzealously safeguarding his employer's interests, he was recklessly unmindful of the interests of Mrs. Hannigan and the duties owed her."); *see Delahanty*, 464 A.2d at 1264-65 (outrageously fraudulent bank employee conduct which enriched the bank was taken with the intent to further the bank's interests, justifying an award of punitive damages against the bank). Again, the test is whether employees acted with the *intent* to further their employer's interests, not whether, as PTS submits, employees *actually* furthered those interests. *See Delahanty*, 464 A.2d at 1265. The evidence Richardson produced at trial showed that PTS agents tortiously cut corners to meet deadlines—the fact that corner-cutting did not serve PTS's interests in hindsight has no bearing on whether PTS's agents acted with servile intent in the first place. Thus, it was reasonable for the jury to find that PTS's agents' acts were committed with the intent to further PTS's interests.

### 3. Within the scope of employment

Third, and finally, the evidence was sufficient for the jury to conclude that PTS's agents' acts were committed within the scope of their employment. Applying the Restatement test that Pennsylvania has adopted: (a) PTS employed its agents to transport prisoners, maintain order, and meet drop-off deadlines; (b) the agents' actions were taken while on a PTS van, during the transport of prisoners; (c) as just discussed, their actions were "actuated, at least in part, by a purpose to serve" PTS's interests in keeping vans full

and moving; and (d) PTS expected their agents' use of force (for example, they were provided non-lethal shotguns, pepper spray, and physical restraints (*see, e.g.*, Doc. 184 at 39-40, 44-45)). Restatement (Second) of Agency § 228.

In arguing the evidence presented at trial ineluctably showed its agents acted outside the scope of employment, PTS largely relies on the exceptions to the Restatement test as stated in *Fitzgerald v. McCutcheon*: conduct which is "excessive and so dangerous as to be totally without responsibility or reason" or "committed for personal reasons or in an outrageous manner" falls outside the scope of employment "as a matter of law." 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979). In support, PTS points to the case of *Howard v. Zaney Bar*, 85 A.2d 401 (Pa. 1952), where the Pennsylvania Supreme Court held that a bartender who shot a male patron in the neck with a pistol for making a pass at a female patron acted outside the scope of his employment, even though it was his duty to maintain order at the bar. *See id.* at 402-03.

PTS's reliance on *Zaney Bar*, though understandable, is misplaced. The Pennsylvania Supreme Court distinguished the facts of the case from cases involving "industrial policemen" who shot others. *Id.* at 403. "The company employing such policem[e]n is liable for the injuries caused" because they are "permitted to carry and use firearms," "make arrests, swear out warrants and even in rare instances to make use of a pistol." *Id.* "The bartender, on the other hand, *qua* bartender, possesses none of the above enumerated powers. . . . The extent to which a bartender can act and yet *remain within his scope of employment* is in no way analogous to the extent to which a municipal policeman may act to maintain order." *Id.* In other words, the company employing a policeman authorizes that policeman to use force and can expect the use of force—whereas a bar also employs a bartender to maintain order, but does not expect the use of force in carrying out that duty. Here, unlike in *Zaney Bar* and more like the cases involving policemen, PTS hired its agents to maintain order and authorized them to use non-lethal shotguns, pepper spray, belly chains, shackles, and handcuffs. PTS's agents' use of force (*e.g.*, pointing a shotgun at Richardson's head and in his mouth, and standing on his shackles), although extreme

12

and outrageous, was therefore expectable by PTS and fell within the scope of employment. *See Strothers v. Nassan*, No. CIV.A 08-1624, 2009 WL 976604, at *9 (W.D. Pa. Apr. 9, 2009) ("The reasoning employed in [*Zaney Bar*] indicates that a police officer's use of force is often *expected* by his or her employer, thereby bringing such conduct with the scope of his or her duties.").

Moreover, judicial opinions should not be read as if they were statutes. *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (Posner, J.). The court in *Fitzgerald v. McCutcheon*, in reciting the scope of employment exceptions, does not necessarily use the words "excessive" and "outrageous" in the same exact sense those words are used in the Restatement's intentional infliction of emotional distress standard. That is to say, conduct which intentionally inflicts emotional distress, while necessarily extreme and outrageous, can still fall within the scope of employment. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1278-79 (3d Cir. 1979) (en banc). So while a reasonable jury could have concluded that Doss and other agents acted out of "personal animosity" rather than an intent to serve PTS's interests, it was also reasonable for this jury to conclude, based on the evidence already discussed, that they acted "out of an intent to perform [their] duties." *Strothers v. Nassan*, No. CIV.A 08-1624, 2009 WL 976604, at *9-10 (W.D. Pa. Apr. 9, 2009) (quotation omitted). "The fact that an assault has been carried out by an employee in an 'outrageous manner' *may be indicative* that the employee has acted out of 'private malice[.]'" *Id.* (emphasis added) (quoting *Lunn v. Yellow Cab Co.*, 169 A.2d 103, 105 (Pa. 1961)). It does not require such a conclusion, however. And I am not free to "re-weigh the evidence" or "set aside the jury verdict because the jury could have drawn" a different conclusion. *Conry v. Baltimore & O. R. Co.*, 112 F. Supp. 252, 256 (W.D. Pa.), *aff'd*, 209 F.2d 422 (3d Cir. 1953). The jury reasonably found that PTS's agents acted outrageously, but also with an intent to serve their employer's interests and within the scope of their employment. I may not disturb these reasonable findings.

PTS's motion will therefore be denied as to the jury's finding of vicarious liability, and as to the punitive damages award.

### **IV. Conclusion**

For the reasons stated above, PTS's motion will be denied.

An appropriate order follows.

April 4, 2019  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge